483 A.2d 772

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Thomas Thornton MURRAY.**

**Misc. (Subtitle BV) No. 29, Sept. Term, 1983.
No. 7, Sept. Term, 1984.**

Court of Appeals of Maryland.

Nov. 21, 1984.

Melvin Hirshman, Bar Counsel, and Walter D. Murphy, Jr., Asst. Bar Counsel, Annapolis, for the Attorney Grievance Commission of Maryland.

Lloyd E. Clinton, Jr., Glen Burnie, for respondent.

Argued before MURPHY, C.J., SMITH, ELDRIDGE, COLE, RODOWSKY and COUCH, JJ., and EDWARD D. HIGINBOTHOM, Associate Judge of the Third Judicial Circuit (retired), Specially Assigned.

PER CURIAM.

The Attorney Grievance Commission, acting through Bar Counsel, filed two Petitions for Disciplinary Action against Thomas Thornton Murray, alleging violations of the Code of Professional Responsibility. We referred both matters, pursuant to Maryland Rule BV9 b, to Judge Kenneth Lavon Johnson of the Circuit Court for Baltimore City to make findings of fact and conclusions of law.

As to the first petition, Judge Johnson found the following facts to have been established by clear and convincing evidence:

"1. In January, 1982, Michael F. McKenney, retained the Respondent to represent him in an uncontested divorce case, after a conference with the Respondent in his Glen Burnie law office. During the conference, it was agreed that Mr. McKenney would pay the Respondent One Hundred Fifty Dollars ($150.00) as an attorney's fee and Seventy Dollars ($70.00) as Court Costs. Mr. McKenney gave the Respondent two checks, one check for One Hundred and Fifty Dollars ($150.00) made payable to the order of the Respondent and one check for Seventy Dollars ($70.00) made payable to the order of the Clerk of the Court. The check made payable to the Respondent cleared the bank and Mr. McKenney later stopped payment on the check made payable to the Clerk of the Court.

"2. Mr. McKenney signed the documents for the filing of a divorce action and gave the same to Respondent in January, 1982. The Respondent promised Mr. McKenney that a divorce proceeding would be instituted in approximately one month from the aforementioned January, 1982, conference.

"3. In May or June of 1982, Mr. McKenney wrote the Respondent requesting to be informed as to the status of his case. Mr. McKenney also spoke with the Respondent on the telephone in the late Spring of 1982, requesting a status report on his case. During this telephone conversation, the Respondent told Mr. McKenney that he had not yet had an opportunity to get downtown but would file the divorce papers as soon as he had an opportunity to get downtown. On or about April, 1983, Mr. McKenney again wrote to the Respondent requesting information concerning the status of his case with negative results. Mr. McKenney at some point during the year 1983 was told by the Respondent that the reason that the divorce lawsuit had not been filed was due to the Respondent's illness. No divorce action was ever filed by the Respondent on behalf of Mr. McKenney. The Respondent returned the One Hundred and Fifty Dollars ($150.00) to Mr. McKenney on January 20, 1984, the same

date on which the Attorney Grievance Commission held an Inquiry Panel Hearing on this matter.

"The Respondent was hospitalized in October, 1982 and operated on in January, 1983 for arterial sclerosis in his legs that prevented him from walking. The Respondent's illness commenced during the later part of 1981, and became serious in 1982. At least by 1983, the Respondent knew that his illness interfered with his rendering the legal services to Mr. McKenney as required by the terms of his employment. The Respondent should have withdrawn from his employment."

As to the second petition, Judge Johnson found the following facts to have been established by clear and convincing evidence:

"1. In October, 1982, Pamela Jean Kelly retained the Respondent to represent her in an uncontested divorce case. It was agreed between Ms. Kelly and the Respondent that the total cost for the divorce would be Two Hundred Thirteen Dollars ($213.00). Ms. Kelly told the Respondent that it was very important to her that he institute and complete the divorce action before the end of the year—1982. Ms. Kelly was aware of the fact that the Respondent had been recently released from the hospital and inquired of the Respondent whether his illness would prevent him from obtaining her divorce before the end of the year. The Respondent replied that there would not be any problems in obtaining the divorce before the end of the year. In addition, the Respondent told Ms. Kelly that if his illness caused him not to be able to handle the case as requested, that he had an assistant who could handle it. The Respondent, during the conference with Ms. Kelly in October, 1982, assured Ms. Kelly that the necessary divorce documents would be typed on the following day and that the case would be expeditiously handled. During the said October 1982 conference, Ms. Kelly gave the Respondent Seventy Dollars ($70.00) in cash and he wrote a receipt for the same on a piece of paper. The balance of the attorney's fees and

costs was to be paid to the Respondent by Ms. Kelly after the divorce documents were served on her husband. During the October 1982 conference, Ms. Kelly told the Respondent that the reason for her wanting to obtain a divorce before the end of the year was to avoid the higher tax consequences that arose from being married and filing a separate tax return from that of her husband.

"2. Approximately two (2) weeks after the October 1982 conference between Ms. Kelly and the Respondent, Ms. Kelly called the Respondent and inquired as to the status of the case. She also informed the Respondent that her husband was at his mother's home and was available for service of process. The Respondent told Ms. Kelly that the papers had been typed and would be served on her husband 'today'. The Respondent never presented Ms. Kelly with any documents to sign for the filing of the divorce action. Ms. Kelly called the Respondent on numerous occasions in November and December of 1982 concerning her case. The Respondent, on one occasion, told Ms. Kelly that the necessary documents had been typed and that the Sheriff had them for service on her husband. Ms. Kelly called the Sheriff and learned that the Sheriff did not have any documents relating to her divorce case.

"3. The Respondent never did institute the divorce action on behalf of Ms. Kelly and represented to her that he had commenced the legal process for the divorce, when he had not done so. Ms. Kelly was required to file her 1982 income tax returns as a married person filing separate from her husband. Therefore, she was required to pay more taxes than she would have had to pay if she had been divorced at the end of the 1982 taxable year.

"4. During the later part of December, 1982, or first part of January 1983, Ms. Kelly asked the Respondent to return the Seventy Dollars ($70.00) that she had paid him. The Respondent returned the Seventy Dollars to Ms. Kelly in January 1983.

"5. The Respondent's illness commenced during the later part of 1981 and became serious in 1982. The Respondent failed to inform Ms. Kelly that his illness would prevent him from performing the legal services for which he had been retained.

"6. The Respondent was aware that his illness would prevent him from performing the legal services required by the retainer agreement and should have withdrawn from his employment."

As to both petitions, Judge Johnson concluded that Respondent had violated the mandatory withdrawal provisions of DR 2–110(B)(3), as charged in the disciplinary petitions.[1] He also concluded as to each petition that Respondent was "incompetent due to physical illness within the meaning of Rule BV1(h), and knew that he could not perform the duties required of him."[2] As to the petition involving Pamela Kelly, Judge Johnson found that in making misrepresentations to her and neglecting her case the Respondent had violated DR 1–102(A)(1), (4) and (5) and DR 7–101(A)(1), (2) and (3), as charged in the disciplinary petition.[3]

---

1. This rule provides:
 "(B) Mandatory withdrawal.
 > A lawyer representing a client before a tribunal, with its permission if required by its rules, shall withdraw from employment, and a lawyer representing a client in other matters shall withdraw from employment, if:
 (1) ...
 (2) ...
 (3) His mental or physical condition renders it unreasonably difficult for him to carry out the employment effectively."

2. Rule BV1 h defines the word "Incompetent" to mean an attorney who is "unable to render adequate legal service by reason of mental or physical illness or infirmity, or addiction to or dependence upon an intoxicant or drug."

3. DR 1–102(A)(1), (4) and (5) provide:
 "(A) A lawyer shall not:
 (1) Violate a Disciplinary Rule.
 (2) ...
 (3) ...

The Respondent took no exceptions to Judge Johnson's° findings. Bar Counsel excepted to Judge Johnson's failure to find, in the McKenney matter, that the Respondent had violated DR 6–101(A)(3) and DR 7–101(A)(2).[1] Bar Counsel also excepted to Judge Johnson's failure to conclude, in the Kelly matter, that Respondent had violated DR 6–101(A)(3) and DR 7–102(A)(5).

Bar Counsel has recommended that Respondent receive a public reprimand and be placed on inactive status "unless he can demonstrate to the Court with well documented

---

(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

(5) Engage in conduct that is prejudicial to the administration of justice."

DR 7–101(A)(1), (2) and (3) provide:

"(A) A lawyer shall not intentionally:

(1) Fail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules, except as provided by DR 7–101(B). A lawyer does not violate this Disciplinary Rule, however, by acceding to reasonable requests of opposing counsel which do not prejudice the rights of his client, by being punctual in fulfilling all professional commitments, by avoiding offensive tactics, or by treating with courtesy and consideration all persons involved in the legal process.

(2) Fail to carry out a contract of employment entered into with a client for professional services, but he may withdraw as permitted under DR 2–110, DR 5–102, and DR 5–105.

(3) Prejudice or damage his client during the course of the professional relationship, except as required under DR 7–102(B)."

**4.** DR 6–101(A)(3) provides:

"(A) A lawyer shall not:

(1) ...

(2) ...

(3) Neglect a legal matter entrusted to him."

As to DR 7–101(A)(2), *see* n. 3, *supra.*

DR 7–102(A)(5) provides:

"(A) In his representation of a client, a lawyer shall not:

(1) ...

(2) ...

(3) ...

(4) ...

(5) Knowingly make a false statement of law or fact."

medical reports that he is presently physically capable of performing the day-to-day duties of an attorney and unless he associates himself with another member of the Bar of this Court who shall monitor his activities as a practicing attorney and report promptly to Bar Counsel should the Respondent fail to act promptly on behalf of his clients." In support of his recommendation, Bar Counsel points out that, as to each petition, Judge Johnson found that Respondent "was incompetent due to physical illness within the meaning of Rule BV1(h)."

We accept Judge Johnson's findings as to the disciplinary rules which he found the Respondent had violated. Moreover, it is clear from Judge Johnson's own factual findings that Respondent also violated the other disciplinary rules charged by Bar Counsel and we, therefore, shall sustain Bar Counsel's exceptions.

We note that Respondent has on two earlier occasions received private reprimands for neglect of client affairs and related misconduct. While we find the Respondent's misconduct in the present case to be extremely serious, in the circumstances, taking into account his severe health problems at the time of his representation of Ms. Kelly and Mr. McKenney, we think a public reprimand, rather than a suspension, is the appropriate sanction. We caution, however, that any further misconduct on Respondent's part similar to that for which he has now thrice been reprimanded will undoubtedly compel a harsher sanction.

It is clear from Judge Johnson's findings, and from Respondent's testimony in this case, that his physical problems have been quite serious. At the time of the hearing before Judge Johnson (June 17, 1984), Respondent was facing three more surgical operations and had restricted his practice to District Court matters. No medical reports are included in the record before us which would justify our placing the Respondent on inactive status even though, as found by Judge Johnson, the Respondent incompetently handled the client affairs in question due in part at least to

physical illness. Maryland Rule BV1 h. At the hearing before us, the Respondent indicated that his health had somewhat improved and he expressed the belief that he would, in the future, competently handle client business. All things considered, we limit the sanction of the Respondent to a public reprimand.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15 c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST THOMAS THORNTON MURRAY.